HUBER *et al. v.* N. O. NELSON MANUF'G CO.

*(Circuit Court, E. D. Missouri, E. D.* May 25, 1889.)

1. PATENTS FOR INVENTIONS—LAPSE OF FOREIGN PATENT.

Letters patent of the United States, granted after an English patent for the same invention had lapsed and become void by reason of non-payment of a stamp duty, *held,* granted without authority of law.

2. SAME.

The commissioner of patents has no authority, under section 4887, Revised Statutes of the United States, to grant letters patent for an invention previously patented abroad, after the foreign patent has expired by reason of the failure of the inventor to comply with some requirement of the foreign patent law.

3. SAME—DURATION OF LETTERS.

Letters patent of the Unted States, issued pursuant to section 4887. only continue in force during the actual existence of the prior foreign patent having the shortest term.

4. SAME—REISSUE—ENLARGEMENT.

A patent for an invention cannot be reissued in such form as to enlarge the original claims, unless there has been a clear mistake inadvertently committed in wording the claims.

5. SAME—COMMISSIONER'S DECISION—REVIEW.

On the trial of an action for infringement of reissued letters patent, the finding of the commissioner of patents, that the original patent was inoperative by reason of inadvertence, accident, or mistake, may be reviewed to the extent of determining whether what was described and alleged to be a mistake when the reissue was applied for was such a mistake as warranted a reissue.

6. SAME—REISSUE—VALIDITY.

Where a patent was surrendered and reissued for the purpose of invalidating a subsequent patent for a similar invention; and one element of a combination claimed in the original letters was omitted in combinations claimed in the reissue, thereby enlarging certain claims; and it appeared that the element so omitted was intentionally included in the combinations as claimed in the original letters, for the purpose of describing a combination that, as a whole, would constitute an operative and useful machine; and such element was in fact necessary to make the machine operative and useful,—*held,* that the enlarged claims of the reissue were void (*a*) because the original claims were not formulated through accident, inadvertence, or mistake; and (*b*) because the patentee had such full knowledge of all the facts, when the original claims were drafted, that his failure to claim the particular combination claimed in the reissue amounted to an abandonment of the same to the public.

In Equity.

This was a bill filed to restrain the infringement of letters patent of the United States No. 260,232, issued June 27, 1882, to Henry Huber, assignee of Peters & Donald, as well as to restrain the infringement of reissued letters patent No. 10,826, issued April 19, 1887, to James E. Boyle. Both patents are for improvements in sanitary water-closets. Huber is owner of patent No. 260,232, and sole licensee under reissued letters patent No. 10,826.

Rev. St. U. S. § 4887, provides that—

"No person shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid, by reason of its having been first patented or caused to be patented in a foreign country, unless the same has been introduce l into public use in the United States for more than two years prior to the application. But every patent granted for an inven-

tion which has been previously patented in a foreign country shall be so limited as to expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term, and in no case shall it be in force more than seventeen years."

*Paul Bakewell*, for complainants.
*Taylor & Pollard* and *Benjamin F. Rex*, for defendant.

THAYER, J. This case has been elaborately argued. Following the course that was pursued by counsel in the argument, the first question for consideration is whether letters patent No. 260,232, issued to Henry Huber, as assignee of Peters & Donald, are valid. The facts in the light of which that question must be determined are not disputed. Peters & Donald are residents of Great Britain. They secured a patent in England on April 7, 1874, for the same invention covered by American letters patent No. 260,232. On April 7, 1881, the English patent, by virtue of English laws, became null and void, on account of the failure of the patentees to pay the stamp duty of £100 which became due on the patent on that day. On November 29, 1881, they filed an application for a patent for the same invention in the United States, and a patent was subsequently granted to Henry Huber as their assignee on June 27, 1882. Peters & Donald appear to have assigned all their interest in the invention, for a nominal consideration, to J. E. Boyle on the 27th of October, 1881, some six months after the English patent had lapsed and become void, and Boyle in turn assigned his interest to Huber on November 26, 1881. Can a patent issued under such circumstances be sustained as a valid grant? The precise question, so far as I am aware, has never been decided in a case arising under the twenty-fifth section of the act of July 8, 1870, now section 4887, Rev. St. U. S. In several cases, however, where a foreign patent had been issued for a given term expressed on the face of the grant, but with a privilege under the foreign law of being extended for a further period, the question has arisen whether the life of the subsequent American patent was limited by the term expressed on the face of the foreign patent in force when the American patent was issued, or whether the American patent continued during the actual existence of the foreign patent, the same having been extended or renewed. *Reissner* v. *Sharp*, 16 O. G. 355; *Refrigerating Co.* v. *Gillett*, 13 Fed. Rep. 553; *Electrical Co.* v. *Electric Co.*, 17 Fed. Rep. 838. In another class of cases the question has arisen whether the termination of a foreign patent prior to the time specified on the face of the grant, by the failure of the patentee to comply with some requirement of the foreign law, had the effect of terminating a subsequently issued American patent for the same invention. *Paillard* v. *Bruno*, 29 Fed. Rep. 864; *Refrigerating Co.* v. *Gillet*, 31 Fed. Rep. 809; *Electric Protective Co.* v. *Burglar Alarm Co.*, 21 Fed. Rep. 458. The decisions of all the circuit courts in the cases above mentioned proceeded consistently upon the theory first outlined by Mr. Justice CLIFFORD, in *Henry* v. *Tool Co.*, 3 Ban. & A. 501,—a case in which the court was dealing with an American patent granted after an English patent, that

had been extended for four years after its expiration, by special order of the crown. The theory thus outlined was, in substance, that every American patent ought to run for a definite period, that may be ascertained as soon as the patent issues, and that congress did not intend by section 4887 of the Revised Statutes that patents should be granted for an uncertain period. In accordance with that view it was held, in substance, in *Henry* v. *Tool Co.*, and in the subsequent decisions, that the life of an American patent subject to the provisions of section 4887 is limited by the term expressed on the face of the prior foreign patent having the shortest term, and that the existence of the domestic patent, when issued, is not affected by any events that subsequently shorten or prolong the life of the foreign patent. Three of the cases above cited were expressly overruled by the recent decision of the United States supreme court in *Refrigerating Co.* v. *Hammond*, 129 U. S. 151, 9 Sup. Ct. Rep. 225, and in my judgment the decision in that case overturns as well the principle on which the other circuit court decisions were predicated. The supreme court has clearly discarded the doctrine that an American patent must necessarily have a fixed term, which may be definitely ascertained at the time letters patent are granted, by holding (as in the cases cited) that the duration of an American patent is dependent upon circumstances that affect the duration of the foreign monopoly. Thus the court say:

"Under section 4887, although * * * the United States patent may on its face run for seventeen years from its date, it is to be so limited by the courts, as matter to be adjudicated on evidence *in pais,* as to expire at the same time with the foreign patent."

And again:

"Under this view the time of the expiration of the foreign patent may be shown by evidence *in pais,* either by the record of the foreign patent itself, showing its duration, or other proper evidence; and it is no more objectionable to show the time of the expiration of the foreign patent, by giving evidence of extensions such as those in the present case, and thus show the time when by virtue of such extensions the United States patent will expire."

In accordance with such views the court held that, although an American patent had been granted subsequent to the issuance of a Canadian patent, which on its face purported to be a grant "for the period of five years," yet that the American patent did not expire at the end of the five years so limited, inasmuch as the patentee, in compliance with Canadian law, obtained an extension of the foreign patent for two additional terms of five years each, after the grant of the American patent. The arguments used in the course of that decision lead logically to the conclusion that United States letters patent issued subject to the provisions of section 4887 remain in force no longer than the foreign patent having the shortest term; that the life of the domestic patent is measured by the actual duration of the foreign patent, and may be abridged, as well as lengthened, by circumstances which operate under the foreign law to abridge or lengthen the foreign monopoly.

When it is conceded that it is not essential that the life of an Ameri-

can patent shall be absolutely fixed at its inception, as by the term expressed on the face of the foreign grant having the shortest term, but may extend beyond that period in consequence of the extension of the foreign patent by acts *in pais,* done by the patentee in compliance with the foreign patent law, that is a concession that the duration of the domestic patent is dependent in one respect on the life of the foreign patent; and, if dependent upon it in one respect, it ought to be regarded as dependent upon it in all respects. At all events if acts done by the patentee in conformity with the foreign law operate to extend the foreign patent beyond the term specified on the face of the original grant, and thereby to prolong the American patent, by parity of reasoning an omission to do acts required by the foreign law, which works an absolute forfeiture of the foreign grant, ought to extinguish the domestic patent. No valid reason can be assigned, I apprehend, why the omission of acts required to be done by the foreign law in order to preserve the life of the foreign patent should have no effect on the duration of an American patent issued under section 4887, so long as acts done by the patentee in compliance with the foreign law are allowed to give the American patent a duration that it would not otherwise have. The whole controversy seems to hinge on the question whether the term of the domestic patent is fixed at its inception by the terms expressed on the face of the shortest foreign patent, or whether the life of the American patent may be to an extent uncertain, and is subject to contingencies affecting the life of the foreign patent. The supreme court of the United States appear to have adopted the latter view. It follows, of course, that if the true construction of section 4887 is that a patent subject to its provisions becomes void when the foreign patent lapses,—in other words, if the life of the domestic patent is dependent upon that of the foreign patent,— then the commissioner of patents has no authority, under section 4887, to issue American letters after the foreign patent has ceased or determined. It would hardly be contended I suppose that the commissioner would be authorized to grant a monopoly of an invention after an event has occurred that in law determines the duration of the monopoly, and which event, if it had occurred after the grant was made, instead of before, would at once have rendered the same void. Commissioner FISHER in the *Case of Mushet,* 2 Com. Dec. 106, shortly after the passage of the act of July 8, 1870, held that section 4887 was intended to allow foreign inventors to secure a monopoly of their inventions in this country after they had been patented abroad, but only for so long a period as the foreign monopoly continued; and that to a casual reader would seem to be the obvious purpose of the statute. The last clause of the section, "but every patent granted for an invention which has been previously patented in a foreign country shall be so limited as to expire at the same time with the foreign patent," etc., presupposes, as I think, that there is a foreign patent for the invention in force when the American patent issues, the actual existence of which foreign patent is to determine the duration of the domestic patent. If there is no such foreign patent in force when the American patent issues, but if a foreign patent

has been theretofore granted for the invention and it has lapsed, and become void, there is no authority in law, in my opinion, for the American grant. The result is that the Peters & Donald patent is adjudged to be void.

2. The next question concerns the validity of reissued letters patent No. 10,826, issued to James E. Boyle, April 19, 1887, and the facts on which that controversy depends are substantially undisputed. The original patent on which the reissue was obtained was numbered 291,139, and was dated January 1, 1884. In the construction of the "flushing apparatus" or water-closet covered by the original letters, Boyle, the inventor, employed what is commonly called an "injector" to exhaust the air confined between two traps located beneath the bowl or seat of the flushing apparatus. The apparatus was so arranged that when in use water falling through a pipe from the water tank or reservoir into the bowl passed by the mouth of the "injector" which was connected by a pipe with the confined air-chamber between the traps, and by the oper-. ation of a well-known principle tended to exhaust the air and to create a vacuum in such chamber, the purpose of creating a vacuum being to induce a more powerful outflow of water from the bowl through the traps and into the soil-pipe, by the aid of atmospheric pressure on the surface of the water in the bowl. The idea of constructing a water-closet or flushing apparatus with double traps underneath the seat, and a confined air-chamber between the same, from which the air might be withdrawn when the closet was used, so as to induce a more powerful outflow, was not novel. The same method of construction was shown in the Peters & Donald patent before mentioned, but Peters & Donald employed a dif-' ferent device to exhaust the air between the traps. Although injectors, and the principle upon which they operated, were well-known, and although they were in use for various purposes, it may be conceded that Boyle was the first to employ them in the construction of a flushing apparatus or water-closet. Being an old device, he could not claim the. injector independently, or otherwise than in combination with other devices forming a part of his improved sanitary water-closet. The first and most important claim in the original letters patent was for "a flushing apparatus, consisting of a reservoir tank; a flushing chamber, adapted to ·be filled therefrom; a valve controlling the admission of water from said tank ·to said chamber; a suction injector, arranged beneath the outlet from said chamber; a flushing pipe leading from said injector; and a suction or air pipe communicating with said injector,—all combined, * * * substantially as set forth, whereby the water in escaping from said chamber into the flushing pipe traverses said injector, and sucks air from said suction pipe." It will thus be seen that the "injector" was one of six elements in the combination covered by the first claim of the original letters No. 291,139. On January 2, 1885, Boyle made application for a reissue, stating, in substance, in his application therefor, that his patent was "inoperative to protect the invention intended to be covered by it," because "the principal claims in said patent were defective, or insufficient, in that they appear to be limited to combinations embodying

the flushing chamber as an essential element, whereas that chamber was not essential to his invention in its generic features;" that he believed he had introduced a new principle for operating double-trapped siphon closets, namely, that of producing a vacuum by causing falling flushing water to act as an injector, but "that through inadvertence or mistake of judgment his claims were drawn with less breadth than his specifications, and did not, as they should, cover broadly the application of such principle;" that "such inadvertence or mistake arose by and in consequence of a misunderstanding between" the inventor and his patent solicitor, and by reason of "the inventor's want of familiarity with the technical meaning of the language used in patent claims." It is admitted that the idea of obtaining a reissue was suggested by the granting of letters patent No. 308,358 to Frank B. Hanson, under date of November 25, 1884, for an improvement in water-closets, which latter patent by one of its claims covered a flushing apparatus the same, substantially, as that described in the first claim of the Boyle patent, above set forth, omitting only the "flushing chamber." Boyle's sole purpose in asking for a reissue was, confessedly, to eliminate the "flushing chamber" as a constituent element of the combination covered by certain claims of his original patent, particularly the first claim. In other words, he desired to recast his claims so as to obtain a patent for a flushing apparatus like that described above in the first claim, minus the flushing chamber. A reissue was eventually granted in accordance with such desire. A claim was allowed in the reissued letters for a "flushing apparatus  *  *  * consisting of the combination of a reservoir tank, a flushing valve controlling the outlet thereof, a flushing pipe for conveying water therefrom to the bowl of the closet, a suction injector arranged in connection with said pipe, and to be traversed by the descending flushing water, and a suction pipe in connection with said injector, whereby the water, in flowing from said tank downward through the flushing pipe, traverses said injector, and sucks the air from said suction pipe." The effect was clearly to expand the claims of the original patent by as much as the addition of the flushing chamber to the combinations claimed in the original patent had served to limit them. *Plow Co.* v. *Kingman*, 129 U. S. 294, 9 Sup. Ct. Rep. 259. Notwithstanding the expansion of the claims in the reissue, it is strenuously insisted that the main feature of Boyle's flushing apparatus (that which was essentially novel) consisted in the use of an injector operated by falling flushing water to pump air from between the two traps; that such fact was clearly shown and commented upon in the original specification; that the flushing chamber was not essential to the operation of that device, a single reservoir tank being sufficient for that purpose; that by inadvertence or mistake a nonessential limitation was put upon the claims of the original patent that covered the injector device; that in consequence thereof the original patent was inoperative to fully secure the invention intended to be claimed; and that the patent was for such reasons properly reissued,—it being a case where the claims have simply been altered to cover more accurately the invention described in the original specification.

Some of these propositions require careful consideration; and, in the first place, it will be well to understand clearly what is meant by the assertion that the original patent was "inoperative to protect the invention intended to be covered by it." The original patent certainly protects the flushing apparatus that was claimed as a whole in the first claim, and carefully described in the drawings. It also protects all the combinations claimed in the several claims of the original patent. It was not necessary to change a word in the specification, or alter a line in the drawings, to fully secure the apparatus so claimed; and it appears that that was the identical flushing apparatus or water-closet which the patentee intended to manufacture, and that his licensee is now manufacturing. It cannot be said, therefore, that the original patent was "inoperative or invalid" in the sense that what the patentee claimed and intended to manufacture he cannot hold in consequence of the original specification being either "defective or insufficient." In the light of these facts, when the patentee asserts that the original patent was "inoperative," no more is meant than that a particular combination of parts might have been claimed originally (and possibly would have been allowed) that was not claimed, and that the original patent was inoperative to protect that particular combination, because no right to protection was asserted. Now, even conceding, for the purposes of the decision, that the original patent was "inoperative" in the sense in which that word is used in section 4916 of the Revised Statutes, which authorizes a reissue, the question remains whether the failure of the inventor to claim what the original patent does not protect because it was not claimed was due "to inadvertence, accident, or mistake," in the sense of the statute. All of the evidence that was before the commissioner tending to show inadvertence or mistake (such as the affidavit of the inventor and his solicitor and other documents) was offered by the complainant in the present case, and was supplemented by some additional testimony. Under such circumstances, I understand the law to be that the court may review the finding of the commissioner, on the point that the original patent was inoperative by reason of inadvertence and mistake, at least to the extent of determining whether, as a matter of law, what was described and alleged to be a mistake is such a mistake as will warrant a reissue. *Miller* v. *Brass Co.*, 104 U. S. 355; *Leggett* v. *Avery*, 101 U. S. 256; *Mahn* v. *Harwood*, 112 U. S. 359, 5 Sup. Ct. Rep. 174; *Coon* v. *Wilson*, 113 U. S. 277, 5 Sup. Ct. Rep. 537; *Turner* v. *Stamping Co.*, 111 U. S. 319, 4 Sup. Ct. Rep. 401. In his affidavit filed with the commissioner, Mr. Fraser, the solicitor who obtained Boyle's original patent, as well as the reissue, describes the mistake alleged to have been committed by him and the patentee as tersely perhaps as it is anywhere described. He says:

"Deponent clearly understood that the invention in question introduced a new principle in water-closet flushing apparatus,—that of exhausting the air by means of an injector,—and so described the invention in the specification, but that in drawing the claims he inadvertently incorporated the flushing apparatus as an element therein, being at the time under the impression that

the said flushing chamber was essential to the operation of the invention, whereas in fact the said chamber is essential only to the operativeness of the devices for producing the 'afterwash,' for refilling the bowl, which devices are claimed specifically in claim 4 of said patent."

It will be observed that the mistake thus described by Mr. Fraser consisted in his being under the impression when he drew the claims of the original patent that "the flushing chamber was essential to the operation of the invention, whereas it was essential only to the operativeness of the devices for producing the afterwash." This statement is a little obscure, because he does not explain whether by the use of the word "invention" in the paragraph quoted he means the injector device only, or the flushing apparatus considered as a whole. I take it for granted, however, that Mr. Fraser did not use the word "invention" in the restricted sense first mentioned, and would not be so understood. He is evidently an expert of too much experience to assert that he acted for a moment under the mistaken impression that it was necessary to employ a "flushing chamber" as well as a "water-tank," in order that the falling flushing water traversing the injector might operate to suck or pump air from between the two traps; and that was the sole function of the injector device. Drawing No. 6, attached to the original patent, and Mr. Fraser's explanation of the purpose of that drawing, contained in the original specification, shows that he clearly understood that the falling flushing water traversing the injector would perform its function of pumping air from between the traps equally well whether the water proceeded from a reservoir having one compartment or a dozen; and that fact was obvious to an ordinary observer who had any knowledge of the principle upon which an injector acts. Therefore, in the paragraph quoted, Fraser must be understood as asserting merely that he incorporated the "flushing chamber" as an element in the several combinations claimed in the original patent because he desired and intended to describe and claim an operative flushing apparatus or water-closet; that is to say, one that would do the work required of such an apparatus, and prove a marketable invention. It is manifest from other statements made by Mr. Fraser in the course of his testimony that in his opinion a flushing apparatus minus the "flushing chamber" with its attendant devices for securing an afterwash would be practically useless; that some provision for refilling the bowl after the injector had ceased to act, thereby sealing the upper trap, was essential to the successful operation of the flushing apparatus or water-closet, considered a whole; and that, in drafting the several claims of the original patent, he intentionally (and with great care, as it would seem) included the flushing chamber, for the reason that it was one of the essential parts of the flushing apparatus, without which the apparatus would not be serviceable. Boyle's affidavit, filed with the commissioner, describes no mistake, inadvertence, or accident. He contents himself with the general statement that a misunderstanding existed between him and his solicitor, but what the misunderstanding was does not appear. From his testimony on the trial of this case it is made manifest, however, that he, as well as Fraser, was of the opinion when

the original patent was granted that a flushing apparatus constructed according to his design, but without the flushing chamber to secure an afterwash, would be practically valueless because it would command no sale. He admits that he made a flushing apparatus, such as is last indicated, (that is, an apparatus minus the flushing chamber;) that it was not satisfactory; that it was not intended to be operative, and (as I understand him) was never intended as a design for a water-closet that he expected to manufacture or sell. The result is that, if Boyle and Fraser made any mistake or labored under any misapprehension when the original patent was taken out, it consisted in the assumption that the omission of the flushing chamber on which the "afterwash" devices depended, and without which there was no means of securing an afterwash automatically, so far as the patentee had then discovered, would leave a practically valueless combination, and hence that there was no need of claming such a combination. When the statements of Mr. Boyle and his patent solicitor are carefully and fairly analyzed that appears to be all that can reasonably be said in support of the contention that the claims of the original patent were due to inadvertence and mistake.

But, conceding that the parties named acted on the assumption last stated, it does not appear that even that assumption was erroneous. On the contrary, the testimony shows to my entire satisfaction that Fraser was right in supposing that Boyle's flushing apparatus without the flushing chamber would be incomplete, and for that reason practically valueless. Mr. Hanson, who, subsequently to the date of Boyle's invention, secured a patent on a water-closet having a single water reservoir and an injector, but no flushing chamber or provision for an afterwash, and who by so doing caused Boyle to apply for a reissue that would invalidate Hanson's patent, is compelled to admit that a water-closet constructed according to the specification of his patent is defective and unsalable, and for that reason has never been put upon the market. Boyle, Hanson, and Fraser substantially agree that some mechanism to secure an afterwash automatically (that is to say, some mechanism to flush the closet, and refill the bowl at the end of the flush, by a single pull on the lever) is essential to the successful operation of a flushing apparatus; that without such mechanism an apparatus constructed with double traps and an injector to exhaust the air between the traps would be useless in the sense that there would be no demand for such an apparatus. It would seem, indeed, that Boyle displayed quite as much (if not more) ingenuity in devising the mechanism to produce an afterwash as in employing an injector, which was an old device, to pump air from between the traps.

Now, in the case of *Mahn* v. *Harwood*, 112 U. S. 359, 360, 5 Sup. Ct. Rep. 174, it was said that "a patent for an invention cannot lawfully be reissued for the mere purpose of enlarging the claim, unless there has been a clear mistake, inadvertently committed, in the wording of the claim;" and the same remark is repeated in *Coon* v. *Wilson*, 113 U. S. 277, 5 Sup. Ct. Rep. 537. In *Miller* v. *Brass Co.*, 104 U. S. 355, the court said:

"Whilst  *  *  *  we do not deny that a claim may be enlarged in a reissued patent, we are of opinion that this can only be done when an actual mistake has occurred; not from a mere error of judgment, but a real *bona fide* mistake, inadvertently committed, such as a court of chancery, in cases within its ordinary jurisdiction, would correct."

So far as I can see, the testimony in the case does not tend to establish that either Boyle or Fraser acted so inadvertently or labored under any such misapprehension, either of matters of law or fact, when the claims of the original patent were formulated, as justified a reissue of the patent under the law as declared in these cases. It was obvious to them, as it is to any one, that the injector would perform its function as well with a single water-tank as with a tank and flushing chamber combined. They both believed that a water-closet constructed according to Boyle's design, but without provision for an afterwash, would be valueless in the market, and in that they were right. The patentee had discovered no method of producing an afterwash automatically by using a single water-tank, and hence both he and his solicitor regarded the flushing chamber as one of the essential features of the flushing apparatus intended to be manufactured, and accordingly claimed it industriously in all of the important claims. Conceding that they claimed the "injector" in combination with a part that was non-essential to its operation, and thereby limited the claim, yet they did so in pursuance of a well-defined purpose that was not based upon a misconception of matters of fact or ignorance of the law, so far as the record before the commissioner, or the proof in this case, shows. It is an important fact that must be kept in mind in the consideration of this case that the injector was an old device when Boyle adopted it, and that it could only be claimed in combination with other parts, which would, together, produce a new result or effect, or constitute a new machine. *Reckendorfer* v. *Huber*, 92 U. S. 357. Boyle placed it in combination with certain other old parts or devices that he deemed necessary to employ to make a new flushing apparatus that would be operative and useful, and by so doing made each element of the combination material, and was undoubtedly entitled to be protected in the use of the combination so formed and claimed. *Water-Meter Co.* v. *Desper*, 101 U. S. 337. His sole purpose in asking for a reissue, however, appears to have been to slough off one element of the combination, and so reduce the parts embraced in the claim that it would be impossible for any other person to use an "injector" in the construction of a double-trapped water-closet without paying tribute to his patent. As the claims are stated and enlarged in the reissue it would be unlawful for a mechanic to us the injector in the construction of a flushing apparatus, even if he should succeed in doing what Boyle failed to accomplish,—that is to say, in producing an afterwash automatically by the use of a single tank,—because the parts with which the injector has been combined in the claims of the reissue are so few that they must necessarily all be used to work the injector. In other words, the claims in the reissued letters, or some of them at least, are now so broad as to practically cover the injector as a thing susceptible of being separately

claimed. If it was new, and had not been claimed in the original patent, it might be proper to interpret the law liberally in favor of the inventor to enable him to realize the full benefit of his invention. The fact is, however, that an injector is an old device, and that Boyle merely adopted it, and applied it to a new use, and should be limited to that combination in which, as it appears, he deliberately placed it, and claimed it. *Prouty* v. *Ruggles*, 16 Pet. 341; *Eames* v. *Godfrey*, 1 Wall. 79.

I am forced to the conclusion that the reissued letters, granted under the circumstances and for the purposes heretofore stated,—that is, merely to enlarge the claims,—cannot be sustained as a valid grant. *Burr* v. *Duryee*, 1 Wall. 531; *Gill* v. *Wells*, 22 Wall. 1; and cases heretofore cited. In the *first* place, although the original patent was inoperative to protect a particular combination not claimed therein, to which the inventor now conceives himself to be entitled, yet the failure to claim it was not due to any such inadvertence or mistake as will now entitle him to claim it, the inevitable result being to expand the old claims; and *secondly*, the failure to claim such combination originally—even if it was one that ought to have been allowed if claimed—occurred under such circumstances, and was accompanied with such full knowledge of all material facts, as amounted to an abandonment of that particular combination to the public. The bill is accordingly dismissed.