**PENN ELECTRIC SWITCH. CO. v. LUTHE HARDWARE CO. et al.**

No. 9490.

Circuit Court of Appeals, Eighth Circuit.

March 1, 1933.

W. P. Bair, of Des Moines, Iowa (Bair, Freeman & Sinclair, Will Freeman, and Earl M. Sinclair, all of Des Moines, Iowa, on the brief), for appellant.

James A. Hoffman, of Washington, D. C. (William A. Strauch, of Washington, D. C., and Lawrence C. Kingsland, of St. Louis, Mo., on the brief), for appellees.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

SANBORN, Circuit Judge.

The parties will be referred to as in the court below; appellant as plaintiff, Luthe Hardware Company as defendant, and United States Gauge Company, intervener.

This is an appeal from a decree dismissing the plaintiff's bill of complaint in a suit for infringement of reissue patent No. 17,342, granted June 25, 1929, to Albert Penn upon an application filed February 6, 1929. The original patent was No. 1,674,341, dated June 19, 1928, the application for which was filed December 12, 1927.

The patent in suit is for an automatic air volume controlling device for water storage tanks. The plaintiff is the owner of the patent and manufactures the device. The defendant hardware company sold a water system which used an air volume controlling device, made by the intervener gauge company,

which the plaintiff claimed was an infringement of claims of the reissue patent. Suit was brought against the defendant, and the gauge company intervened and assumed the defense. The defenses asserted were lack of invention, noninfringement, and, further, that the claims of the reissue patent upon which the plaintiff relies were invalid. The court reached the conclusion that the claims granted in the reissue patent which were in addition to those contained in the original patent were invalid, being broader than the original invention, and that no inadvertence or mistake was shown which would justify the allowance of such claims, and that there was no infringement of the valid claims of the patent.

The devices involved in this suit are comparatively simple. The water storage tanks with which they are designed to be used are those into which water is forced by a pump and expelled by compressed air. They are commonly known as pressure tanks. Theoretically, if only water is pumped into an airtight tank and only water is expelled from it, the volume of air in the tank remains constant at all times. In practice, however, it is found that some air becomes absorbed by or mixed with the water and is expelled with it, so that, in order to prevent the tank from becoming inoperable from a reduced volume of air, it is necessary to provide means for pumping air as well as water into the tank. This is done by providing an air intake port on the inlet side of the pump. This port has a check valve to permit air to enter the pump cylinder and to be forced into the tank with the water. This valve is known as the snifter valve. When the valve is open, the pump injects both air and water into the tank, and when it is closed, water only. The pumping of water is ordinarily automatically regulated by the air pressure in the tank, that is, the pump operates when the pressure falls below a predetermined amount, and closes when the pressure is again restored. It was desirable that the volume of air as well as the air pressure should be automatically controlled. Manual operation of the snifter valve required a glass or indicator on the exterior of the tank so that the operator would know when the volume of air should be increased. A failure to open the valve at the proper time resulted in too little air, while a failure to close it at the proper time after it had been open caused too much air to enter. The device invented by Penn was apparently the first satisfactory solution of the problem of automatic air volume control for storage tanks.

Penn's solution of the problem, as shown by his original patent, was this: He provided a screw-threaded opening in the tank at the maximum level that it was desired that the water should reach. He provided a screw-threaded fitting to screw into this opening, having a bore open at both ends, the bore being internally screw-threaded at its inner end to receive a tube to support a float. The tube extended toward the interior of the tank and was designed to receive rotatably a shaft or float arm. The shaft was journaled in sleeves pressed into the tube, and projected beyond the fitting and tube on the exterior of the tank. A portion of the inner end of the shaft was bent at right angles to form a float arm extending through a slot formed in the inner end of the tube. The edges of the slot acted as stops for the float arm and prevented the shaft from rotating except within certain limits. A float was connected with the end of the float arm. The exterior portion of the fitting had an extension which held a valve tube and a valve member coacting with the upper end of the valve tube and held against it by a spring also attached to the fitting. The valve tube was connected by a tube or pipe with the air intake port of the water pump, so that, when the valve was raised, air would pass through the valve tube into the intake port of the pump and thence into the tank. For raising the valve member, Penn provided a cam mounted upon the exterior projecting end of the shaft. This cam had a flat portion which, when the float in the interior of the tank was depressed, was below the spring which held the valve closed, but, when the water in the tank had raised the float, the float would lift the float arm, the float arm would turn the shaft, the shaft would turn the cam, the cam would raise the spring, the spring would raise the valve, the valve would permit air to flow through the valve tube into the intake port of the pump, and the pump would force the air into the tank. As the air pressure was thus increased in the tank and water expelled therefrom, the float would be lowered with the lowered level of the water, and the cam would return to its normal position, permitting the valve to assume its normal state, thus closing the valve member and stopping further flow of air into the pump. To prevent leakage around the shaft, suitable spring-pressed packing was provided in the shaft tube.

The device was a simple, unitary structure, and the float, float arm, shaft, and tube were of such size and so arranged that they could be inserted through the opening in the tank. The device was ingenious, inexpensive,

and practical, and met with commercial success.

In his original application for a patent, Penn asked for the allowance of fourteen claims, all of which read upon his particular device. He was allowed two claims, which appear to cover adequately the invention disclosed by the drawings and specifications of his original patent. He acquiesced in the disallowance of all rejected claims, many of which were broader than those allowed. The claims of the original patent are:

"1. A float controlled air valve comprising a fitting adapted to be screwed into a tank, a tube extending therefrom, a shaft in said tube, a float at the end of said tube and connected with said shaft for rotating the same, said tube and float being adapted to be inserted in said tank through the opening which receives said fitting and a valve on said fitting adapted to be opened by rotation of said shaft caused by said float when liquid in the tank rises to a predetermined level.

"2. A float controlled air valve comprising a fitting adapted to be screwed into a tank, a tube extending therefrom, a shaft in said tube, a float at the end of said tube and connected with said shaft for rotating the same, said tube and float being adapted to be inserted in said tank through the opening which receives said fitting, a valve tube on said fitting, a valve member normally contacting with one end of said tube, a cam on said shaft adapted to raise said member upon actuation of the shaft caused by the rise of liquid in said tank to a predetermined level which causes said float to be raised."

The record shows that the development of the form of device shown in the original patent began in August or September, 1927, and that late in 1927, and up to May, 1928, Penn was developing another type of automatic air control device, which eliminated the necessity of having a tube to receive rotatably a shaft, a shaft, and a cam, and depended for the operation of the valve on the exterior of the fitting by direct action of a float and float arm attached to the fitting and extending into the tank. The application for the reissue patent was made February 6, 1929, some seven months after the original patent was granted. Prior to the filing of this application by Penn, the intervener had also developed an automatic air control device which would operate a valve on the exterior of a fitting similar to that of Penn, by the direct action of a float and float arm extending through said fitting from the interior of a tank. The later Penn device and

the device of the intervener are substantially identical.

In applying for a reissue letters patent, Penn states on his oath:

"The claims in the original application did not bring out positively the real invention of deponent. Claims should have been drawn to clearly point out a fitting adapted to close an opening in a tank and the fitting serves as the entire medium of mounting the float device, valve and complete operating mechanism and the like upon the tank.

"That deponent in the matter of the original application by mistake and inadvertence and misunderstanding of the scope and spirit of the invention and without knowing the real importance of claims of an application, secured claims, which claims are unnecessarily limited and with no claims broad enough to cover applicant's true contribution by way of invention.

"That the description of the specification of the original patent gives an erroneous impression as to the breadth and scope of deponent's invention, by insufficiently describing the function of applicant's device, particularly in the mounting of the fitting into an opening in the water storage tank.

"The advantage of such construction was not fully and completely emphasized and pointed out in the original specification.

"Deponent's contribution by way of invention has to do with an Air Volume Controlling Device for Water Storage Tanks wherein a float valve mechanism and other parts associated therewith are all mounted upon a fitting which is provided with a screw threaded neck and which coacts with a screw threaded opening formed in the tank."

The application asked for the allowance of six claims, including the two contained in the original patent. These were at first rejected, but, after amendment and an interview with the examiner, five claims were allowed, including the original claims.

It is only necessary to refer to the last claim, which reads: "5. A float controlled air valve, comprising a fitting adapted to be secured in and to form a closure for an opening in a tank for sealing said opening, a float arm carried by said fitting, a float on said arm, a valve member carried by said fitting on the exterior of said tank, said valve member being normally closed, said float arm arranged to positively open said valve by direct action thereon when liquid in the tank rises to a predetermined level, said float arm and float being capable of being inserted

through the opening in said tank and together with said valve member being supported solely by said fitting whereby a unitary structure is provided."

If the claims added by the reissue patent are valid, they cover virtually any unitary air control device in which the air valve is directly actuated by a float and float arm, the float and float arm being capable of insertion through the opening of the tank, and the fitting upon which the float, float arm, and valve are mounted forming a closure for such opening.

The accused device consists of a fitting to which is attached a float and float arm, the float arm passing through a flexible hose or "sylphon" bellows, which is sealed to the arm and to the fitting to prevent leakage, and through the bore of the fitting, a valve member on the exterior of the fitting which is normally closed but which is opened by the direct action of the float arm when the water in the tank reaches a certain level. It is a unitary structure, and the float and float arm are inserted through a screw-threaded opening in the tank; the fitting closes this opening. The device has no cam, no rotating shaft, no tube, and no such packing arrangement as the first Penn device, unless the flexible means of preventing leakage is so regarded. If Penn's additional reissue claims are valid, they are infringed by the accused device; otherwise there is no infringement, because the original claims do not cover it.

It seems clear that Penn, when he first applied for a patent, had not in mind anything more than his own specific method for controlling the volume of air in a storage tank, and his specifications, drawings, and claims were all referable to a specific device or invention. He had not at that time conceived the idea, which he later conceived, of doing away with the shaft receiving tube, the rotating shaft, and cam, and relying solely upon the direct action of the float arm to actuate the air valve. It was no doubt his realization of the advantages and economies of the simpler and more inexpensive later device that prompted the reissue application. His contention is, however, that his invention as originally disclosed entitled him to the broad claims of the reissue patent, and that his failure to make and receive such claims may be said to be due to inadvertence, mistake, and misunderstanding.

Section 64, title 35, U. S. C. (35 USCA § 64), provides: "Whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification, to be issued to the patentee. * * * *"

It is settled law that the power to reissue may be exercised when the patent is inoperative by reason of a defective or insufficient specification, or because the original claims were narrower than the actual invention, provided the error has arisen from inadvertence, accident, or mistake, and the patentee is guilty of no fraud or deception, and provided that the reissue shall be for the same invention as the original patent, as such invention appears from the specifications and claims of the original, and shall not cover or embrace what has been previously rejected upon the original application. Topliff v. Topliff, 145 U. S. 156, 170, 12 S. Ct. 825, 36 L. Ed. 658; Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U. S. 38, 42, 14 S. Ct. 28, 37 L. Ed. 989; Parker & Whipple v. Yale Clock Co., 123 U. S. 87, 102, 8 S. Ct. 38, 31 L. Ed. 100; Miller v. Brass Company, 104 U. S. 350, 26 L. Ed. 783; Kansas City Southern Railway Co. v. Silica Products Co. (C. C. A. 8) 48 F.(2d) 503, 506.

In James v. Campbell, 104 U. S. 356, 370, 26 L. Ed. 786, the court said: "The court ought not to be called upon to explore the entire history of an art in order to ascertain what a patentee might have included in his patent had he been so disposed. If he was the author of any other invention than that which he specifically describes and claims, though he might have asked to have it patented at the same time, and in the same patent, yet if he has not done so, and afterwards desires to secure it, he is bound to make a new and distinct application for that purpose, and make it the subject of a new and different patent. When a patent fully and clearly, without ambiguity or obscurity, describes and claims a specific invention, complete in itself, so that it cannot be said to be inoperative or invalid by reason of a defective or insufficient specification, a reissue cannot be had for the purpose of expanding and generalizing the claim so as to make it embrace an invention not described and specified in the original."

In Russell v. Dodge, 93 U. S. 460, 462, 23 L. Ed. 973, Mr. Justice Field, speaking for the court, said: "Where a useful result is

produced in any art, manufacture, or composition of matter by the use of certain means for which the inventor or discoverer obtains a patent, it is, as justly observed by the presiding justice of the Circuit Court, too plain for argument, that the means described must be the essential and absolutely necessary means, and not mere adjuncts which may be used or abandoned at pleasure."

In Gill v. Wells, 22 Wall. 1, 24, 25, 22 L. Ed. 699, the Supreme Court, speaking of the grantee of a patent for a combination of old elements, said:

"Such a patentee as the one last mentioned may subsequently discover that he can accomplish a new and useful result by a combination embracing less than the whole number of the ingredients included in the prior patented combination, but he cannot secure the right and privilege of a patentee in the combination of the smaller number of the ingredients by a surrender of his first patent and a reissue of the same which shall include the second combination as well as the first, because the reissued patent in that event would not be for the same invention as the surrendered original.

"Nor could that change be allowed under the present Patent Act for another reason equally decisive, which is that the description of the other combinations, beside the first, would constitute a new matter, the introduction of which into the specification of a reissued patent is expressly forbidden by the fifty-third section of that act."

In Huber v. Nelson Manufacturing Co., 148 U. S. 270, 292, 13 S. Ct. 603, 610, 37 L. Ed. 447, it was said: "There is nothing in the original patent which suggests any such combination as is claimed in claims 1, 2, and 4 of the reissue, or which suggests the possibility that Boyle's invention could be operated by a combination which omitted the flushing chamber as an element thereof. Every one of the elements which is made a part of the several combinations claimed in the original patent is thereby made material to such combinations."

See, also Olin v. Timken, 155 U. S. 141, 146, 147, 15 S. Ct. 49, 39 L. Ed. 100.

In Brown & Bigelow v. Louis F. Dow Co. (C. C. A. 8) 42 F.(2d) 785, 787, the court approved this language of a law examiner: "While mere changes in terminology may not be objectionable in a reissue application, when such changes go to the substance of the invention and modify it in material respects either as to form or relationship of its elements or as to its principle of operation, then they are objectionable as involving new matter."

The court below was of the opinion that the invention disclosed by Penn in his original patent was not the same invention as that which he sought to cover by the expanded claims of the reissue patent, and we have reached the same conclusion. The purpose of Penn's original invention was not to close a screw-threaded opening in a storage tank with a screw-threaded fitting, or to demonstrate that a float and float arm could be mounted upon a fitting so as to operate a valve also attached to the same fitting, which was not new, or that such a float and float arm might be passed through a hole of suitable size in a tank. That a float and float arm could be used to operate directly a valve was not only clearly shown by the prior art, but was something well within the mental grasp of any ordinary mechanic familiar with household plumbing. Penn's efforts were directed to providing a mechanism for automatically removing the cap of the snifter valve upon a pump used to supply a storage tank, and his invention consisted of his combination of old elements which used the force of the float-induced rotation of a shaft to operate a cam which in turn raised the cap of the snifter valve. There is a clear distinction between the means shown by the patent for accomplishing the result and the means employed by the defendant which did not include several of the elements of Penn's combination which are essential to its operation. The defendant's device, since it omits these elements, does not infringe the original claims. Dunbar v. Meyers, 94 U. S. 187, 202, 24 L. Ed. 34; Reedy v. Scott, 23 Wall. 352, 366, 23 L. Ed. 109.

While it may be doubtful whether, in view of the prior art, there was in fact any patentable novelty in Penn's later device or in the claims of the reissue patent which read upon it, we do not need to decide that question. If there was patentable novelty and Penn was the first one to conceive the idea, he can obtain a patent for this later invention upon the application which the record shows he has filed.

We regard claims 3, 4, and 5 of the reissue patent as invalid, and the decree of the lower court is affirmed.